The South Coast Corporation, Individually and as Successor to the South Coast Co. v. Commissioner.
South Coast Corp. v. Commissioner
Docket No. 446 P.T.
United States Tax Court
1947 Tax Ct. Memo LEXIS 323; 6 T.C.M. (CCH) 96; T.C.M. (RIA) 47023; January 31, 1947
J. Sterling Halstead, Samuel J. Sherman, Esqs., and Harry Janin, C.P.A., for the petitioner. Royal E. Maiden, Jr., and Lloyd C. Hooks, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion This proceeding arises from the disallowance by the respondent of a claim *324 for refund, as amended, filed by the petitioner for the refund of amounts paid as processing taxes under the provisions of the Agricultural Adjustment Act, as amended, with respect to the processing of raw sugar into refined sugar. A timely claim for refund was originally filed by the petitioner, The South Coast Corporation, in the amount of $144,584.28. Subsequent thereto, an amended claim for refund in the amount of $244,424.40 was filed in which the name of the claimant was stated as "The South Coast Company and the South Coast Corporation, successor to the South Coast Company pursuant to 77B reorganization". The claim for refund, as amended, was disallowed in full by the respondent by an appropriate letter dated March 27, 1943, on the ground that petitioner had not established that it had borne the burden of the tax. Both the original and amended claims were filed pursuant to Title VII of the Revenue Act of 1936, and were on the official form prescribed by the respondent, namely, P. T. Form 79. The question for decision is whether the petitioner is entitled to any refund of the tax, and if so, in what amount? The facts have been presented to the Court by stipulation, oral testimony *325 and documentary evidence. Findings of Fact The petitioner, The South Coast Corporation (hereinafter referred to as the "Corporation"), is a corporation with its principal office in New Orleans, La. Its predecessor, The South Coast Co. (hereinafter referred to as the "Company"), had been placed under an equity receivership in June 1930, by the United States District Court for the Eastern District of Louisiana, and receivers had been appointed for and took possession of the business and assets of the Company. In June 1934, a proceeding was filed for the reorganization of the Company pursuant to Section 77B of the Bankruptcy Act and on May 6, 1935, trustees were appointed to manage, operate and conduct the business and property of the Company. Pursuant to the Plan of Reorganization of the Company, the Corporation was organized on July 15, 1935, and on or about September 30, 1935, an order was entered by the District Court vesting in the Corporation all the assets and properties of the Company and its estate in reorganization including the Company's claim against the United States for refund of processing taxes. For the purposes of this case, the operations of the Corporation and its *326 predecessor Company, will be considered together as if one taxpayer-corporation, and references hereinafter made to "petitioner" will apply both to the Corporation and to its predecessor in reorganization, except where otherwise expressly indicated. The business of the petitioner during all the times material to this proceeding was the operation of sugar cane plantations in the State of Louisiana, the production and purchasing of sugar cane, the processing of sugar cane into raw sugar, the selling of raw sugar, the processing of raw sugar into refined sugar and the selling of refined sugar. In addition raw sugar was purchased in the fall of 1935 and in the spring of 1936. All of the raw sugar produced during the pertinent periods was produced from sugar cane either grown or purchased from others. Refined sugar was produced by the petitioner from raw sugar derived from puchased cane and grown cane and also from purchased raw sugar. The petitioner did not sell any sugar cane. Petitioner also produced molasses during 1932. Petitioner owned and operated four sugar plantations known as divisions and respectively designated as the Oaklawn Division, the Ashland Division, the Terrebonne *327 Division and the Georgia Division. Petitioner's grinding and refining operations were seasonal in character during the period material in this proceeding. The raw sugar factories at Terrebonne and Oaklawn were operated for only a short time each year, beginning with the grinding season which starts with October of each year and ends in January of the following year. The factory at Georgia, which did refining as well as grinding was operated during the same periods; in addition raw sugar was refined at the Georgia factory during the periods from June 1, 1934, to July 24, 1934, and from February 1, 1936, to May 31, 1936. When not in operation, the factories remained idle undergoing repairs. The petitioner was a processor within the meaning and intent of the Agricultural Adjustment Act of 1933, as amended, with respect to the first domestic processing of raw sugar into refined sugar. The processing tax on the refining of sugar took effect on June 8, 1934. The statutory "tax period" with respect to which the petitioner actually paid processing taxes began on June 8, 1934, and ended on November 30, 1935. The statutory "period before and after the tax", hereinafter sometimes referred *328 to as the "base period", extended from June 8, 1932, to and including June 7, 1934, and from February 1, 1936, to and including July 31, 1936. In its claims for refund, which are incorporated herein by reference, petitioner submitted marginal computations for a "period before and after the tax" covering the period from October 1, 1933, to and including June 7, 1934, and the period from February 1, 1936, through May 1936. No marginal data was furnished in the claims covering the other parts of its statutory base period, showing "average prices paid or received by representative concerns engaged in a similar business and similarly circumstanced" which "were necessary for a fair comparison". During the period from June 8, 1934, to September 30, 1935, processing taxes were paid on behalf of the company and its estate in reorganization to the collector of internal revenue for the district of New Orleans, La., in the total amount of $220,351.53, on the dates and in installments as follows: Refined sugar
produced
Processing
Dates processed
(pounds)
taxes paid
Dates paid
June 8 to 30, 1934
6,896,300
$ 24,423.82
October 29, 1934
12,471.39
December 22, 1934
July 1 to 24, 1934
6,869,800
36,753.43
November 9, 1934
October 20 to 31, 1934
3,058,600
16,363.51
December 1, 1934
November 1 to 30, 1934
9,143,100
48,915.59
January 2, 1935
December 1 to 31, 1934
8,524,800
45,607.68
February 20, 1935
January 1 to 21, 1935
6,694,600
35,816.11
February 28, 1935
Totals
41,187,200
$220,351.53
*329 Processing taxes were paid to the same collector by the Corporation on sugar processed during the period from October 1, 1935, to November 30, 1935, in the total amount of $24,072.87, on the dates and in installments as follows: Refined sugar
produced
Processing
Dates processed
(pounds)
taxes paid
Dates paid
October 25 to 31, 1935
2,195,100
$11,743.70
December 2, 1935
November 1 to 30, 1935 (tax paid on 1/4 of
production)
2,304,500
12,329.08
January 2, 1936
Totals
4,499,600
$24,072.87
The total processing taxes so paid by the petitioner amounted to $244,424.40, which represented the processing of 45,686,800 pounds of refined sugar during the tax period. The quantity of raw sugar processed to produce this amount of refined sugar was 48,884,876 pounds. In the twenty-four months immediately preceding the effective date of the processing tax, namely, June 8, 1932, to and including June 7, 1934, (hereinafter referred to as the pre-tax period), and in the period from February 1, 1936 to and including July 31, 1936 (hereinafter referred to as the post-tax period), the petitioner processed the following quantities of refined sugar in pounds: *330 Pre-tax period:
1932
November and December
1933
October
529,800
November
7,227,500
December
8,105,300
1934
June 1 to 7
1,554,200
17,416,800
1936
February
10,793,100
March
10,481,000
April
8,848,100
May
9,526,800
39,649,000
Total
57,065,800
Quantity processed in terms of raw sugar: 57,065,800 X 1.07 *
61,060,406
Plus: Number of pounds of raw sugar required to produce 288,508 gallons of com-
mercial or edible molasses produced at Georgia factory during November and
December 1932
577,016
Total pounds of raw sugar processed during pre-tax and post-tax
periods
61,637,422
The processing tax with respect to direct consumption sugar which became effective on June 8, 1934, was at the rate of one-half of one cent per pound (or 50 cents per hundredweight) on raw sugar processed into refined sugar. As 107 pounds of raw sugar are required to produce 100 pounds of refined sugar, the amount of tax per pound of refined sugar was $.00535 per pound, or $.535 per hundredweight. Sugar *331 cane is not a one-year crop. Each planting yields crops in three or four successive years. Cane was planted at petitioner's plantations in August and September of each year, and was cultivated in the spring of the following year, such cultivation usually being completed in the month of June. The cane was harvested in October, November and December of the year following the year of planting. The first cutting of the cane planted was called "plant cane" and cuttings in subsequent years were called "stubble cane". There were first, second, and, occasionally, third year stubble cane. Both "plant cane" and "stubble cane" from prior plantings were harvested in the fall of the same year. Of petitioner's total acreage planted with sugar cane, about one-third was in plant cane and two-thirds in stubble cane. At the time plant cane was harvested it was not possible for petitioner to estimate with certainty the amount of stubble cane which would be obtained in succeeding years from the same acreage. This was due to the fact that an early frost or other weather conditions might reduce the amount of stubble which could be obtained. The only by-products produced by the petitioner in making its *332 raw sugar were nonedible blackstrap molasses and bagasse. Blackstrap molasses is derived as a byproduct from processing sugar cane into raw sugar and from the refining of raw sugar into refined sugar. Bagasse is a residue resulting from the processing of sugar cane into raw sugar. The 288,508 gallons of commercial or edible molasses produced at the Georgia factory during November and December 1932 had a gross sales value of $28,572.68. The 577,016 pounds of raw sugar required to produce this quantity of molasses were derived from the production of raw sugar at Georgia from the 1932 crop. During the period from June 8, 1932, to October 25, 1933, the Company, then in receivership, did not produce any refined sugar. With the exception of the 577,016 pounds of raw sugar used in producing the 288,508 gallons of molasses referred to above, the 1932 crop, harvest of which began in October 1932, and the purchases of cane during the same period were ground into raw sugar and sold in that state by the receivers of the Company. On January 31, 1934 the Company had on hand the following quantities of raw sugar from the 1933 crop at the plantations indicated: Georgia
400,224 1bs.
Terrebonne
10,144,610 1bs.
Oaklawn
6,191,418 1bs.
*333 This raw sugar was processed into refined sugar between June 1, and July 24, 1934. In the period June 1, to 7, 1934, 15,542 hundredweight of refined sugar was produced by the Company from this raw sugar. On June 8, 1934, the Company had on hand 15,828 hundredweight of refined sugar and paid a floor stock tax thereon. Of the 1935 crop of cane, harvest of which began in October 1935, only that part which was processed in October 1935, and one-fourth of that part processed in November 1935, fell within the statutory tax period and was tax paid. On February 1, 1936, petitioner had on hand the following amounts of raw sugar from the 1935 crop at the plantations indicated which was processed into refined sugar at the Georgia factory during the period from February 1, to May 31, 1936: Terrebonne
11,056,877 1bs.
Oaklawn
16,889,810 1bs.
No raw sugar was purchased by the petitioner during the pre-tax period. The only raw sugar purchased and refined during the tax period was 278,015 pounds of raw sugar with a cost of $8,889.22, which was refined in the period from November 1, to 8, 1935. During the post-tax period, 13,964,832 pounds of raw sugar with an aggregate cost of *334 $479,620.60 were purchased and processed into refined sugar. Petitioner kept its books on an accrual basis. Its fiscal year began on February 1 of each year, and ended on January 31 of the following year. On its books and records petitioner kept its farm operations separate and apart from factory operations. During the grinding season the cane grown by petitioner was transferred to its factories at market value just as if the cane had been purchased from an outside source. At the end of the grinding season petitioner substituted its computation of the actual cost of own-grown cane for the above-mentioned transfer value in its books and records. In computing actual cost under the method of accounting used by petitioner, all initial planting and cultivation costs were charged to the first year's crop, i.e., to the plant cane, without deferring or allocating any part of such costs to the subsequent stubble cuttings. Petitioner's indirect costs in the growing of its cane were also charged to the crop harvested in the year in which these costs were incurred and none of them were projected or deferred to subsequent years, although the indirect costs were just as much a part of the cost *335 of growing cane as the direct expenses. [1] Petitioner did not find it practical or satisfactory to carry over any indirect expenses from the year when incurred and allocate them to subsequent years when stubble cane, which had benefited from the indirect expenses, was cut. Petitioner's experience was that indirect expenses were substantially the same each year and it would not have made any difference in the determination of the cost of each year's crop if indirect costs had been carried over and allocated. Petitioner planted leguminous crops at intervals on its cane acreage in order to enrich the soil. The entire cost of each such leguminous crop was charged to the following cane harvest; petitioner did not attempt to project such cost over the years that cane was grown on the enriched acreage. *336 The South Coast Company, its receivers, trustees and The South Coast Corporation paid the following scale of wages per diem in its agricultural operations for the 1933, 1934 and 1935 crops: 1935
1934
1933
Planting, cultivating, etc.
Laborers - male
$1.00
$ .90
$ .80
Teamsters
1.05
.95
.80
Stabler
1.20
1.10
1.00
Water boys
.60
.50
.40
Harvesting
Cane cutters - male
1.40
1.40
1.15
Cane cutters - female
1.00
1.00
.90
Teamster
1.50
1.50
1.25
Stabler
1.40
1.40
1.20
Water boys
.80
.75
.50
Cane piler
1.40
1.40
1.20
Loader
.80
.60
.50
Hoist operator
1.75
1.75
1.60
Petitioner's original and amended claims for refund are incorporated herein by reference. Petitioner's "cost of commodity" during the statutory base period and the tax period, as set forth in its amended claim for refund, was as follows: Base period
1932 June 8 to Dec. 31
none
1933 Jan. 1 to Sept. 30
none
October
$ 15,896.99
November
216,865.65
December
243,203.32
1934 January
none
February
none
March
none
April
none
May
none
June 1-7
50,057.19
1936 February
335,914.21
March
326,200.71
April
275,379.90
May
296,501.69
June
none
July
none
$1,760,019.66
Tax period
1934 June 8-30
$ 211,642.12
July
210,832.45
October
96,440.29
November
288,289.79
December
268,792.94
1935 January
211,087.96
October
65,403.75
November
68,663.27
$1,421,152.57
*337 These figures show the cost of raw sugar refined on the basis of "book cost" without any reference to farming profit. By "book cost" is meant the cost of growing the cane without any allocation of the initial planting cost. It does not appear that above costs are adjusted for Agricultural Adjustment Act benefits received by petitioner. At the hearing of this cause, petitioner offered the following computations as to its "cost of commodity"; On basis of
On basis of book
book cost
cost after alloca-
ting planting &
Base period
cultivating costs
1932 (Nov. and
Dec.)
$ 15,604.30
$ 15,571.05
1933 (Oct. 25-Dec.
27)
481,186.24
483,560.55
1934 (June 1-7)
52,553.24
52,729.06
1936 (Feb. 1-May
27)
1,220,640.07
1,213,536.84
Total cost
$1,769,983.85
$1,765,397.50
Tax period
1934 (June 8-July
21)
443,700.18
445,184.61
Oct. 17, 1934-Jan.
19, 1935
841,980.32
810,123.94
Oct. and Nov. 1935
129,236.81
128,671.04
$1,414,917.31
$1,383,979.59
The computation based on "book cost" set forth immediately above is submitted by petitioner as being substantially the same as the computation of "cost of commodity" contained in petitioner's *338 amended claim, except for minor variations in the figures where adjustments were made after further examination of the books. Farm profit or loss was eliminated in arriving at these "book cost" figures but it does not appear that adjustments have been made for Agricultural Adjustment Act benefit payments. Petitioner sold its sugar principally in the Mississippi Valley in competition with the large non-grower refiners such as American Sugar Refining Co., C. & H. and National Sugar Refining Co., and with local refiners such as Colonial, Sterling, Henderson and Godchaux. Refined sugar prices are usually established by the large non-grower refiners who do not grow their own sugar cane but purchase raw sugar and produce refined sugar therefrom. As a small grower and refiner, petitioner was not able to fix prices but had to follow the prices established by the large refiners. Since petitioner did not produce a complete variety of sugars such as powdered, lump, yellow clarified and soft, it sold its sugar at a differential below the established market price, which was a customary practice in the sugar trade. Petitioner sold refined sugar from its 1933 and 1934 crop at a "guaranteed differential" *339 of 20 cents per hundred pounds under "American, C & H, and National's prices". This meant that petitioner guaranteed that its price would be at least 20 cents per hundredweight below the price established by these large refiners. In the latter part of 1935 and going in to 1936, this differential was reduced to 10 cents per hundredweight. The published market prices of refined sugar per hundred pounds during the periods material to this proceeding were: 1932
June 8 - June 15
$3.70
June 16 - June 19
3.80
June 20 - July 10
3.90
July 11 - July 17
4.00
July 18 - Aug. 11
4.10
Aug. 12 - Aug. 17
4.15
Aug. 18 - Oct. 2
4.25
Oct. 3 - Oct. 16
4.15
Oct. 17 - Nov. 27
4.25
Nov. 28 - Dec. 31
4.15
1933
Jan. 1 - Jan. 3
$4.15
Jan. 4 - Jan. 8
4.00
Jan. 9 - Jan. 17
3.95
Jan. 18 - Mar. 7
3.90
Mar. 8 - Mar. 21
4.10
Mar. 22 - Apr. 19
4.20
Apr. 20 - Apr. 22
4.30
Apr. 23 - June 7
4.50
June 8 - July 12
4.60
July 13 - Sept. 20
4.70
Sept. 21 - Nov. 8
4.60
Nov. 9 - Dec. 7
4.50
Dec. 8 - Dec. 18
4.40
Dec. 19 - Dec. 31
4.30
1934
Jan. 1 - Feb. 10
$4.30
Feb. 11 - Apr. 17
4.50
Apr. 18 - May 3
4.30
May 4 - May 22
4.20
May 23 - June 7
4.10
June 8 - June 24
4.65
June 25 - Oct. 1
4.75
Oct. 2 - Nov. 8
4.65
Nov. 9 - Dec. 2
4.50
Dec. 3 - Dec. 20
4.40
Dec. 21 - Dec. 31
4.30
1935
Jan. 1 - Feb. 10
$4.30
Feb. 11
4.25
Feb. 12 - Mar. 24
4.30
Mar. 25 - Mar. 26
4.50
Mar. 27 - Mar. 28
4.70
Mar. 29 - Apr. 22
4.90
Apr. 23 - Apr. 28
5.10
Apr. 29 - July 17
5.25
July 18 - July 22
4.90
July 23 - Sept. 22
5.10
Sept. 23 - Nov. 26
5.30
Nov. 27 - Dec. 2
5.10
Dec. 3 - Dec. 15
5.00
Dec. 16
4.90
Dec. 17 - Dec. 22
5.00
Dec. 23 - Dec 31
4.90
1936
Jan. 1 - Jan. 5
$5.00
Jan. 6 - Jan. 27
4.75
Jan. 28 - Mar. 2
4.65
Mar. 3 - Mar. 4
4.55
Mar. 5 - Mar. 10
4.65
Mar. 11 - Mar. 24
4.75
Mar. 25 - Mar. 30
4.85
Mar. 31 - July 9
5.00
July 10 - Aug. 23
4.75
*340 The general practice of the sugar industry was to sell sugar on a deferred payment basis coupled with guarantees to the customer against future price declines. Petitioner followed this practice. During the period material here petitioner had in force a four-payment plan, a six-payment plan, and a deferred payment plan, with accompanying guarantees against future price declines. The four-payment plan permitted the customer to pay the invoice in four equal installments, seven, fourteen, twenty-one and thirty days after the date of the arrival of the sugar. Any price decline taking place prior to the respective payment dates reduced the price of the unpaid-for sugar to the extent of the decline. The four-payment plan was in effect during 1934 and 1935; it was discontinued on January 2, 1936. Petitioner also made some sales in 1934 under a six-payment plan which operated similarly. The deferred payment plan adopted January 2, 1936, was similar to the four-payment plan, except that the effective period of the guarantee was limited to the date of arrival of the sugar instead of being extended to the due day of payment. Petitioner's sugar was sold in bulk 100-1b. bags and in smaller packages *341 of 5, 10 and 25 pounds each. The sugar in smaller packages was customarily sold at a differential of 15 cents more per 100 pounds for the 25 and 10 pound packages, and 25 cents more per 100 pounds for the 5 pound packages. Most of petitioner's sales were made through brokers, and as a rule brokerage commissions of 5 cents per hundred pound bag were paid. The brokerage and commissions account in petitioner's books reflected the fees paid by petitioner in connection with the sales of refined sugar. Prior to the fall of 1935, practically all of petitioner's sales were so-called spot sales, i.e., sales for immediate delivery. The bulk of petitioner's shipments of refined sugar in 1936 was from advance bookings. Petitioner, at times, also granted confidential or special allowances to some of its customers, but did not give these to all customers and in connection with every sale. The amounts of these allowances varied and were agreed upon with prospective purchasers as the occasion arose. The allowances also varied in the different territories in which petitioner's sugar was sold in order to meet competitive conditions. Prior to January 1, 1936, these allowances, generally, were not *342 shown on the face of the invoice, but the customer was advised to deduct the allowance when making his remittance; in some cases the allowance was set out on the fact of the invoice. Where the allowance was not shown, petitioner would later make a notation on the face of the invoice showing the amount thereof. Petitioner followed no consistent policy in the treatment of these allowances on its books; at times transactions would be recorded in petitioner's sales journal at the list price less the confidential allowance and at other times only the regular list price would be entered. Beginning January 1, 1936, petitioner changed its practice so that only a net amount, list price less any confidential allowance, was quoted to prospective purchasers; only this net amount was set forth on the invoice. The record is not entirely clear as to how the allowances were treated in the sales journal after the new procedure was adopted, but apparently transactions were entered at the net amount. Petitioner found it advantageous to make carload deliveries since storage charges at consignment points were thereby saved, and, therefore, petitioner sometimes gave allowances to customers on sales in *343 carload lots. In the case of sales in less than carload lots it was at times necessary to store the sugar in a warehouse, and warehouse storage and insurance charges had to be paid by petitioner. Such warehousing was necessary to make sugar available to small dealers in such markets as Chicago and Cincinnati, and also because petitioner did not have adequate storage facilities of its own. The customary charges paid by petitioner was 2 1/2 cents per bag handling, and 2 1/2 cents storage for the first month, and 2 1/2 cents for each month thereafter. It appears that freight was usually absorbed by petitioner to the extent that it exceeded the customary "freight prepay", that is, the freight rate from the refinery nearest the particular market. The freight or freight absorption account in petitioner's books reflected the amount of freight charges absorbed by petitioner with respect to sales. A cash discount of 2 percent was allowed to petitioner's customers if they made payments at the due date or within a reasonable time thereafter. This was a customary discount in the sugar industry and the customers generally took advantage of it. The discounts account in petitioner's books reflected *344 the amount of such discounts. During the base period petitioner granted allowances to its customers amounting to $7,816.34 and absorbed freight charges in the amount of $8,738.87. Allowances granted to customers in the tax period amounted to $34,338.06 while freight absorption in that period amounted to $13,802.14. Until the fall of 1934 petitioner's sugar was sold under the brand name "South Coast". The brand name was changed to "White Gold" at about the time that refining operations started with respect to the 1934 harvest. There was no actual difference between the sugar sold under the two brand names. During the transition period while petitioner was using up the bags labeled "South Coast" which it had on hand, petitioner was selling both "South Coast" and "White Gold" sugar at the same list price. A certain amount of sales resistance was encountered in the changing of brands since buyers were somewhat skeptical of a new brand, but there was not as much sales resistance as there would have been if petitioner had been trying to put an entirely new article on the market. Although petitioner's sugar apparently was of as good quality as other sugars of the same type, its product *345 was not as well known as those put out by some of its competitors. Petitioner therefore gave the confidential or special allowance to induce buyers to buy its product. On the date that the processing tax of $.535 per hundred pounds of refined sugar went into effect, namely, June 8, 1934, there was a general increase in the refining industry in the price of refined sugar amounting to 55 cents per hundred pounds. Petitioner increased the list price on its refined sugar by 55 cents per hundred pounds at that time, although petitioner made no sales on that particular day. There is no evidence that "American, C. & H. and National", the large refiners whose price petitioner followed, did not follow the general rise and that their prices during the tax period did not include any part of the tax. Petitioner's "guaranteed differential" under "American, C. & H., and National's" price had no relation to the tax. No evidence has been presented to establish that the large refiners, against whose prices petitioner's price was pegged, ever reduced their prices during the tax period by substantially the amount of the tax. In its amended claim for refund, petitioner stated that its average selling *346 price per pound of refined sugar for the period June 1, to 7, 1934 (immediately preceding the tax) was $.0403341 and for the period from June 8, (the effective date of the tax), to June 30, 1934, was $.0455, thus reflecting an increase of $.0051659 per pound. Petitioner at times sold refined sugar to the stores owned and operated by it at each of its plantations. With one exception all sales of refined sugar by petitioner during the period from January 1, to June 30, 1934, were to these stores. The exception was a sale of 25 bags at $4.05 each to William Falgout on June 5, 1934, which was at the same list price as sales made by petitioner to its stores on or about that date. In the period from May 7, to June 7, 1934, petitioner sold 45,700 pounds of refined sugar to its stores at $4.05 per hundred pound bag. From June 5 to 7, 1934, an additional 48,300 pounds were sold to the stores at $4.00 per hundredweight of which 48,000 pounds were sold on June 7. Petitioner's first sale after the imposition of the tax was made on June 22, 1934, 10,000 pounds of refined sugar being sold to the Georgia store at $4.55 per hundredweight. From June 22 to July 31, 1934, 72,000 pounds at $4.55 per *347 hundredweight were sold to the stores. On July 26, and July 30, 1934, 20,000 pounds were also sold to these stores at $4.65 per hundred-weight. A total of 186,100 pounds were sold by petitioner to its stores in the period betweenmay 7, and July 31, 1934. These sales to the company-owned stores were entered in the sales register of petitioner as sales, and were credited to the sales account in the general ledger. The sales to petitioner's stores in the period immediately before and after the effective date of the processing tax were treated by petitioner as ordinary sales insofar as price was concerned and the prices paid by the stores represent the prevailing price at which petitioner offered its sugar for sale at this time. Petitioner's actual average selling price per pound for the period June 1, through 7, 1934, was $.0401935, and for the period from June 8, through June 30, 1934, its actual average selling price per pound was $.0455, thus reflecting an increase of $ 0053065 after the effective date of the tax. In July of 1934, petitioner sold 320,000 pounds through K. L. Fox, a broker, at a price of $4.45 per hundredweight, and 58,500 pounds to M. O. Rose, at $4.55 per hundred-weight. *348 Petitioner's invoices Nos. 1 and 3 dated July 7, and July 16, 1934, respectively, illustrate the transactions through Fox. On the face of No. 1 appears the typewritten statement: "800 bags South Coast Fine Gran. sugar at 4.758 $3,806.40". Beneath the typewritten statement is a long-hand comment: "Price Reduction Allowance $80.00" and the difference between $3,806.40 and $80, namely, "$3,726.40". On the reverse side of the invoice is the following long-hand notation: 800 bags at 4.45
3,560.00
prepaid freight
201.50
Freight diff.
4.90
206.40
3,766.40
Less 5" per bag storage allowance
40.00
3,726.40
Invoice No. 3 indicates on its face that the gross price per bag was $4.658, but there is no notation of any price reduction allowance. It appears that in these sales through Fox, petitioner did not absorb the freight differential but included it in computing the gross price charged to the customer per bag. Petitioner's average price per pound on refined sugar sold by it from June 22, through July 31, 1934 was $.0448628, which amount represents an increase of $.0046693 over petitioner's average price for June 1, through 7, 1934. Between August *349 1 to 20, 1934, petitioner made the following sales: To: Stores
83,700 lbs. at $4.63 per 100 lbs.
M. O. Rice
76,300 lbs. at 4.60 per 100 lbs.
Exkerly
5,000 lbs. at 4.55 per 100 lbs.
K. L. Fox
901,500 lbs. at 4.47 per 100 lbs.
K. L. Fox
45,700 lbs. at 4.45 per 100 lbs.
All of the refined sugar sold by petitioner in 1933 was sold to a single purchaser (Sucrest Corp.) in a special transaction at 25 cents under the market price. In connection with this sale, petitioner did not have to pay any brokerage, freight or warehousing charges. In addition the purchaser furnished part of the bags required for the sugar. Aside from the sale to Falgout, petitioner sold no refined sugar in 1934 prior to the effective date of the processing tax, except to its plantation stores. Petitioner's gross sales, as reflected on its books after eliminating bag size differentials, and the quantities of refined sugar produced and sold for each of the months of the statutory tax period, and of the period before and after the tax in which refined sugar was produced, were as follows: Sales
value of re-
fined sugar
Quantity
Quantity
sold (before
of sugar
refined
allowances
Average in-
Total value
refined
sugar sold
and freight
voice price
of pro-
(Pounds)
(Pounds)
absorption)
Per pound *
duction **
Period
Pre-Tax
Nov. and Dec. 1932
$ 28,572.68 *
October 1933
529,800
240,000
$ 10,440.00
$.04350000
23,046.30
November
7,227,500
7,230,800
308,851.00
.04271325
308,710.01
December
8,105,300
8,174,700
338,606.85
.04142131
335,732.14
June 1-7, 1934
1,554,200
78,800
3,167.25
.04019350
62,468.74
Tax
June 8-30, 1934
6,896,300
22,500
1,023.75
.04550000
313,781.65
July
6,869,800
448,100
20,088.55
.04483050
307,976.57
October
3,058,600
8,467,800
370,464.25
.04374976
133,813.02
November
9,143,100
7,947,700
344,743.75
.04337654
396,596.04
December
8,524,800
6,602,900
275,729.31
.04175882
355,985.59
January, 1935
6,694,600
6,691,500
274,114.41
.04096457
275,241.41
October
2,195,100
1,780,300
87,229.30
.04899697
107,553.25
November
2,304,500
6,013,200
288,665.20
.04800525
110,628.10
Post-Tax
February, 1936
10,793,100
7,908,400
349,331.60
.04417222
476,755.19
March
10,481,000
5,844,700
258,254.62
.04418612
463,114.72
April
8,848,100
7,284,800
323,342.80
.04438595
392,731.32
May
9,526,800
2,619,400
119,506.14
.04562347
434,645.67
*350 In its amended claim, petitioner submitted the following data as to the sales value of the articles derived from the commodity processed by it, which sales value was adjusted for allowances and freight absorption; Selling price
Quantity of
(after allowances and
Sales value of
Period
sugar refined
freight absorption)
Price per pound
sugar refined
1933
October
529,800
$ 10,440.00
$.0435000
$ 23,046.30
November
7,227,500
309,241.15
.0427672
309,099.94
December
8,105,300
338,727.15
.0414360
335,851.21
1934
June 1-7
1,631,100
6,281.70
.0403341
65,788.95
June 8-30
6,896,300
1,023.75
.0455000
313,781.65
July
6,869,900
19,867.53
.0443372
304,592.13
October
3,058,600
365,138.96
.0431209
131,889.58
November
9,143,100
338,740.64
.0424338
387,976.48
December
8,524,800
260,211.15
.0394086
335,950.43
1935
January
6,694,600
265,433.76
.0396673
265,556.71
October
2,195,100
87,361.38
.0490712
107,716.19
November
2,304,500
288,787.62
.0480256
110,674.99
1936
February
10,793,100
347,740.93
.0439710
474,583.40
March
10,481,000
255,947.62
.0437914
458,977.66
April
8,848,100
323,059.29
.0443470
392,386.69
May
9,526,800
119,701.98
.0456982
435,357.61
*351 The processing tax was never billed by petitioner as a separate item on invoices to its customers. Petitioner's general ledgers reflected a break-down of the amounts of its sales as between the processing tax paid with respect to the goods sold and the amount of such sales over and above the processing tax paid. Petitioner never entered into any agreements of any kind with its customers with respect to the processing tax. Petitioner also did not make any agreements with its customers under which petitioner obligated itself to make a refund of any processing tax, and made no refunds of such tax to any of its customers on sugar sold or delivered. In one case, a customer deducted from the invoice price the amount of the processing tax, whereupon petitioner sued and recovered the amount of the tax so withheld. Subsequent to the invalidation of the tax on the processing of sugar on January 6, 1936, petitioner declined to make any refunds to its vendees of refined sugar on the ground that "the processing tax was merely a part of the cost, the same as fuel oil, real estate taxes, income taxes, labor, materials, etc., and fluctuation in the price of any one of those items would not affect *352 the settlement price for sugar either up or down." On January 20, 1938, the petitioner, through its then president, C. F. Dahlberg, addressed a letter to one of its customers, the body of which reads as follows: Replying to your letter of January 12th in regard to tax on 50 bags of WHITE GOLD sugar which you had on hand as of January 6th, 1936. I will answer your questions in the order stated. 1. No form of contract was then in effect between our companies. 2. The processing tax on same was included in the price as a cost of the sugar, but not as a separate item. 3. So far as this company is concerned, we know of no refund that you have received on account of processing taxes, or any other item covering this sugar. 4. You are not entitled to a refund from us of the processing tax, or any other item in connection with this shipment. Processing taxes were a part of our cost just as much as bags, twine, labor, fuel, etc., and were added in as such by us; and whether processing taxes were reduced or increased made no difference whatever in the contract existing between you and ourselves, which called for the delivery of a certain amount of sugar at a certain fixed price without *353 any reference whatever to the processing tax in question. We have already made a return to the Government in the amount of 80% of the processing taxes which were not paid by us, this being under the so-called unjust enrichment law. In view of the fact that the price of sugar remained the same after the tax was declared unconstitutional as before, the fact that you suffered a loss for which you are entitled to a refund is not apparent. In replying to a letter from one of its customers requesting that the customer "be furnished with a letter from you stating that the processing tax was included in the price as charged to us" (referring to a certain shipment of White Gold sugar received by the customer on January 6, 1936), the petitioner, through its then vice-president, wrote a letter to the customer dated October 24, 1936, the body of which read: In response to your letter of October 22nd: We advise that processing tax of 53 1/2" per cwt. was included in the cost of "White Gold" Pure Cane Sugar shipped to you on January 3, 1936, according to our invoice number 60. On October 24, 1934 (during the tax period), petitioner's predecessor, through its then receivers, wrote the following *354 letter to the collector of internal revenue at New Orleans, Louisiana: Attached hereto we hand you monthly returns covering processing of sugar cane products for the period June 8 to June 30 and for the months July, August, and September of this year, showing 137,661 bags of refined sugar as having been produced, the tax on which, at 53 1/2 " per hundred pounds, amounts to $73,648.64. All of the sugar refined since June 8 was the product of raw sugar produced in our own mills from cane grown in 1933 and carried in the shape of raw sugar until the first part of June for the purpose of refining and disposition to the trade as refined sugar as soon as it was thought a logical marketing of such refined sugar was possible; and since the refining was completed we have put forth continuous efforts to sell the sugar, with the result that we have sold and collected for 45,652 bags, the tax on which at 53 1/2" per hundred pounds amounts to $24,423.82. We have just entered our grinding season and will employ during the next ten weeks over four thousand persons, which requires, for at least the first half of that period, an outlay of money for wages and supplies in excess of the money we *355 expect during that time to collect for sugar produced, for which reason it would seriously hamper our operations and inflict a great hardship on us if we were now required to pay the full processing tax on the sugar in question before same is collected by us. To do so would mean that we would have to use our operating money for that purpose. This company being in receivership has no open banking credit, and it would be impossible for us to immediately provide funds for the payment of this tax in advance of sale and collection without depleting our cash resources to the point of hampering our necessary operations, which are being conducted under orders of the United States Court. For the reasons cited above, we ask that we be allowed at this time to make a partial payment to the extent that we ourselves have collected such tax, amounting to, as indicated above, $24,423.82; and we respectfully request an extension of ninety days for the payment of the balance, by which time we expect all of the sugar in question to have been billed, out and paid for. We urge that this request for extension be given favorable consideration. Petitioner received benefit payments from the United *356 States under the provisions of Sugar-Cane Production Contracts dated December 17, 1934, and February 8, 1935, and entered into between petitioner's predecessor and the Secretary of Agriculture, pursuant to the provisions of the Agricultural Adjustment Act, as amended. Benefit payments were received in the following amounts: Benefit payments
Total
15 (b)
Rec'd by The South Coast Co.,
receivers and trustees: March 1-July 31, 1935
$172,203.00
$172,203.00
Rec'd by The South Coast Cor-
poration: Oct. 1935
301,935.87
Nov. 22, 1935
1,389.35
Dec. 1935
4,329.32
May 11, 1936
12,877.25
Nov. 16, 1936
21,801.91
Aug. 4, 1937
37,526.77
$552,063.47
$172,203.00
Contract Section
Benefit payments
15 (c)
16 (a)
16 (b)
Rec'd by The South Coast Co.,
receivers and trustees: March 1-July 31, 1935
Rec'd by The South Coast Cor-
poration: Oct. 1935
$204,557.19
$ 97,378.68
Nov. 22, 1935
1,200.21
189.14
Dec. 1935
2,343.21
1,986.11
May 11, 1936
9,283.94
3,593.31
Nov. 16, 1936
21,801.91
Aug. 4, 1937
37,526.77
$217,384.55
$103,147.24
$59,328.68
The foregoing benefit payments were allocable to specific *357 plantations as follows: Payment
Georgia
Ashland
Terrebonne
Oaklawn
$172,203.00
$ 46,100.00
$ 68,660.58
$21,916.12
$ 35,526.30
204,557.19
38,276.90
76,856.14
42,704.78
46,719.37
97,378.68
25,482.24
38,013.68
13,848.41
20,034.35
1,200.21
1,200.21
189.14
189.14
2,343.21
476.07
1,867.14
1,986.11
125.51
1,860.60
9,283.94
4,344.52
4,939.42
3,593.31
2,033.36
1,333.29
226.66
21,801.91
21,801.91
37,526.77
25,446.80
12,079.97
$552,063.47
$131,661.05
$215,355.08
$98,812.92
$106,234.42
Benefit payments were made only to a producer and none were received by petitioner with respect to cane purchased or raw sugar purchased. The payments were paid upon the basis of cane grown and harvested, regardless of whether such cane was ultimately processed into refined sugar. In Schedule D of its Amended Claim, petitioner stated that its average margin per pound of raw sugar processed was $.00597131 for the tax period and $.01205615 for the period before and after the tax or the base period. This average margin shown for the base period exceeded the average margin for the tax period by $.00608484 per pound. Schedule *358 D further stated that petitioner had processed 48,994,456 pounds of raw sugar during the tax period and that the amount of tax burden borne by petitioner was $298,123.42. Petitioner, therefore, claimed a refund of the entire amount of the processing tax paid by it, namely, $244,424.40. Section D-2 of Schedule D in petitioner's Amended Claim reads as follows: D-2. Other Evidence (Claimant shall list below each document, exhibit, statement of facts, and other evidence submitted with and made a part of this schedule in support of the showing as to margins, or in rebuttal thereof and tending to establish that he bore the burden of the tax. See also pars. 7 (a) and 7 (c) of instructions.) *
*359 The tax burden borne by the claimant is not in excess of the processing taxes actually paid. The following schedules are attached hereto and made part of this claim to substantiate claimant prima facie showing: I. Determination of sales value of articles processed from commodity. II. Raw sugar used in refining. III. Cost of raw sugar refined. IV. Cost of raw sugar produced. Since the prima facie showing results in a tax burden borne by the claimant of $244,424.40, apparently no rebuttable [rebutting] evidence need be submitted at this time. The claimant reserves the right to submit rebuttable [rebutting] evidence if necessary. Opinion KERN, Judge: At the hearing of this case, petitioner offered certain evidence, to the admissibility of which respondent objected on the ground that petitioner should not be permitted to submit evidence to this Court which had not been submitted to the respondent in support of the claim and prior to the disallowance thereof. We took under advisement respondent's motion to strike such evidence from the record. Before proceeding to a consideration of the merits of this case, it is therefore necessary to consider the questions of evidence *360 thus presented. We shall first consider the questions of evidence generally and later in this opinion deal with some of the specific questions involved herein. On brief, respondent has elaborated on its contention with regard to the admissibility of this evidence, and urges that "petitioner should not be permitted to submit evidence before this Court in purported proof of facts which had not theretofore been submitted to the respondent in support of the claim and prior to the disallowance thereof." Respondent further states "* * * it is not so much the fact that this identical evidence was never presented to the Commissioner but that no factual basis was presented to the Commissioner which would justify the introduction of such supplemental facts and data in an effort to cure the fatal defects in the claim. In short, the basic facts which the proposed exhibits purport to establish must have been presented to the Commissioner prior to the disallowance of the claim as a statutory prerequisite to the introduction of said exhibits at the hearing before this Court." One of the arguments presented by petitioner in support of its position that this evidence is admissible is that "respondent, *361 by auditing petitioner's claim and amended claim and reviewing all its books and records at length, thereby waived the right to object to the admission of any evidence contained in those books and records or based thereon relating to or supporting petitioner's claim or any of the figures set forth therein." Petitioner also argues that the evidence in question "is proper and pertinent proof to rebut and overcome the inference which the respondent would have this Court draw from the facts elicited by the respondent regarding the universal price increase on June 8, 1934, and to repel and counteract the doubts which respondent's cross-examination has cast upon other facts in petitioner's case." We think that respondent's objections as to the admissibility of the evidence in question must be sustained, except as to certain evidence pertaining to the allocation of petitioner's initial planting and cultivating costs. Our reasons for not sustaining the objection to the evidence on the allocation of initial costs will be discussed later in this opinion. In proceedings of the type here before us the petitioner is limited to proof of facts or grounds which had been submitted to the Commissioner *362 in support of its claim and prior to the disallowance thereof. This does not mean that petitioner is here restricted to the identical evidence presented to the Commissioner, but rather that petitioner may not now offer evidence of additional facts or new facts on which the Commissioner has not had the opportunity to pass. , certiorari denied ; , certiorari denied ; ; and . In its original and amended claims, petitioner submitted margin computations based upon the cost of raw sugar as reflected on its books. Under the accounting practice followed by the petitioner, initial planting and cultivating costs were all charged on the petitioner's books to the first year's crop, without allocating or deferring any part of such costs to the subsequent "stubble" cuttings. Respondent has attacked petitioner's margin computations on the ground that such "book-cost" figures do not represent the "actual cost" *363 of the commodity processed by petitioner, as defined in section 907(b)(5)(a), supra. Respondent points out that the method of cost computation followed by petitioner in its claims was condemned as improper and erroneous in , cert. denied . Even if we accept the doctrine of the Gay case as being correct, we do not consider that we are required to hold that petitioner's "cost of commodity" figures are so wrong as to vitiate the margin computations. Petitioner has offered certain evidence as to its "cost of commodity" after allocating the initial planting and cultivation costs, which show the effect of spreading part of the planting and cultivating costs over subsequent years when "stubble-cane" was harvested. Respondent asserts that this evidence is not admissible because it was not offered to respondent prior to the rejection of the claim. We can not agree with respondent's contention and hold this allocation evidence to be admissible. This evidence is not offered to set up any new facts or grounds as a basis for recovery on the claim, but to substantiate as substantially correct *364 the cost figures used by it in calculating the margin computations which were submitted to the respondent. This evidence proves that the cost-of-commodity figures used in petitioner's margin computation are not so erroneous as to give a distorted picture of the cost of petitioner's commodity. We think that the allocated cost figures establish that the unallocated figures submitted by petitioner are a reasonably correct statement of the actual cost of the commodity processed by petitioner within the meaning of section 907(b)(5). [2] It is common knowledge that there is wide variance in accounting practices and that "cost" may be determined by various methods, all reaching substantially the same result. Petitioner has long followed its method of not allocating initial planting and cultivating costs in determining its costs and apparently has found the method to be completely satisfactory. The fact that there is so little variance in the cost data under the unallocated and allocated methods shows that petitioner was justified in using the unallocated method. We may accept the corrected book cost figures submitted by petitioner at the hearing of this cause as being an accurate statement *365 of petitioner's "cost of commodity," and substantially the same "cost of commodity" used in the margin computations submitted to respondent. In view of the conclusions which we reach later in this opinion, we need not determine whether these figures should be adjusted for the amount of Agricultural Adjustment Act benefit payments received by petitioner. There is nothing in the record here before us to support petitioner's contention that respondent waived any right to object to the admission of any evidence in this proceeding by reason *366 of the fact that respondent "audited petitioner's claim and amended claim and reviewed all its books and records." The record before us establishes nothing more than that respondent's representatives examined petitioner's books and records for the purpose of verifying the data contained in the claim and amended claim. In filing the claim and amended claim petitioner focused the respondent's attention on the allegations contained therein and there are no grounds for believing that respondent made any investigation other than that required to substantiate the material contained in the claims. It can not be successfully contended that respondent could make such an examination only at the risk of waiving all rights to object to the introduction in evidence of any and all material contained in the books and records. Cf. , affirmed , affirmed , and We shall defer consideration of other specific questions of evidence until our statement of the positions of the two parties with reference to the instant case makes their importance *367 apparent. Petitioner urges that its average margins based on its cost of raw sugar constitute prima facie evidence that petitioner absorbed the entire amount of the processing tax. Petitioner's contentions are based upon section 907 of the Revenue Act of 1936. [3]
*368 We are of the opinion that petitioner has not submitted such data as to establish the presumption provided for in section 907. Subsection (c) of that section provides that the "period before and after the tax" shall mean the twenty-four months immediately preceding the effective date of the processing tax, and the six months, February to July, 1936, inclusive. This means that the pre-tax period pertinent to the instant case should extend from June 8, 1932, to June 7, 1934. Yet petitioner's pre-tax period, as shown in its claims and by the evidence before us, extended only from October 1933 to June 7, 1934, a period of about 8 months. Similarly, petitioner has a post-tax period of only four months as compared to the six months provided for by the statute. Thus instead of having a thirty-month statutory comparative period "before and after the tax" petitioner has only a twelve-month "period before and after the tax." To take care of situations such as this Congress provided further in section 907(c) that if during any part of such period the claimant was not in business, or if his records for any part of such period are so inadequate as not to provide satisfactory data on prices paid *369 for commodities purchased or prices received for articles sold, the average prices paid or received by representative concerns engaged in a similar business and similarly circumstanced may with the approval of the Commissioner, where necessary for a fair comparison, be substituted in making the necessary computations. The petitioner has not offered any price data of "representative concerns" to cover the missing 18 months of the statutory base period, nor has it requested the respondent to furnish such data. Petitioner's contention that its refining operations were seasonal and concentrated within approximately four months of each year has been given full consideration. However, if in the computation of the base period margin, the period from June 8, 1932, to October 1933 should be entirely ignored, as urged by petitioner, the inevitable result is to arrive at a grossly distorted average margin for the "period before and after the tax." The published prices of refined sugar per hundred pounds, which petitioner has introduced into evidence and which are set forth in our findings, shows that on June 8, 1932, the price of refined sugar was $3.70 per hundred pounds, and that this price *370 prevailed until June 15, 1932. During the remaining part of 1932, the highest published price was $4.25. From January 1, to April 22, 1933, the highest price was $4.30, and for a considerable part of that period sugar was quoted at less than $4.00 per hundredweight. After April 22, 1933, the published price of refined sugar rose until it reached a peak of $4.70 on July 13, which was held through September 20. During the remaining part of 1933 and until February 10, 1934, the refined sugar price was never below $4.30. It is thus apparent that if we ignore that portion of the base period prior to October, 1933, the petitioner would have the benefit of the higher prices during the latter part of the pre-tax period and none of the compensating detriment by reason of the lower prices during the earlier part of the pre-tax period. The prima facie case provided for by section 907 is an artificial concept at best and we, therefore, believe that the provisions of that section must be strictly construed. The statutory method of making a prima facie case is exclusive and we do not think that any material deviation, such as we certainly have here, is permissible. Cf. ; *371 ; ; and ; , affirmed . Even if we assume, arguendo, that petitioner's average margin computations establish a presumption that petitioner bore the burden of the tax, we are still of the opinion that petitioner can not prevail, for the respondent has offered evidence which rebuts the presumption within the meaning of section 907 (e) (2). The proof offered by respondent is among the kinds expressly mentioned by the statute as tending to rebut the presumption and, we think, had the effect of making the presumption inoperative. ; ; and , cert. denied, October 14, 1946, . Specifically, respondent has proved that on the effective date of the processing tax, petitioner increased the sale price *372 of its refined sugar by substantially the amount of the tax. In doing so petitioner followed the universal practice in the entire sugar industry, since, as stated by petitioner's own witness, the petitioner's competitive position was such that it "had to follow the market". Respondent has also introduced into evidence a number of "writings" indicating that petitioner's sale price included the amount of the tax. Petitioner, in turn, is permitted by section 907 (e) (2) to "establish that such acts were caused by factors other than the processing tax, or that they do not represent his practice at other times. Section 907 (e) (1) indicates, although it does not necessarily limit the "factors" involved in 907 (e) (2), that such factors include "any clearly shown change (A) in the type or grade of article or commodity, or (B) in costs of production". True, petitioner changed the name of its brand of sugar in the fall of 1934 from "South Coast" to "White Gold", but there is no evidence that this amounted to a change in the type or grade of the sugar sold by petitioner, nor does petitioner make any such contention. Petitioner has attempted to prove before this Court that there were changes *373 in its "cost of production" but there is no evidence that petitioner advanced any such grounds to the Commissioner. Therefore, in view of the rule enunciated at the beginning of this opinion, we are now unable to consider petitioner's contentions in this connection. In its claim and amended claim in the proceedings before the respondent, and in the present action, petitioner has endeavored to show that its average margin computations based upon its cost of raw sugar, constitute prima facie evidence that it absorbed the entire amount of the processing tax. The cost of raw sugar relied upon in these computations was the actual cost to the petitioner of producing the raw sugar. Petitioner now also seeks to show that it absorbed the full amount of the processing tax by introducing several new average margin computations in which the "cost of commodity", i.e., the cost of the raw sugar, is determined by methods not relied upon heretofore. In the first new computation the "cost of commodity" is based upon the cost of raw sugar produced by petitioner from purchased cane. In the other new computation the "cost of commodity" is based upon the market price of raw sugar current at the time *374 when petitioner produced the sugar here involved. We are of the opinion that we may not here consider these new margin computations. Petitioner did not submit any such grounds to the respondent and, as heretofore indicated, we may not here consider evidence of additional or new facts on which the respondent did not have the opportunity to pass. In predicating its "cost of commodity" on some basis other than that submitted to the respondent, as petitioner now seeks to do, petitioner is injecting new facts into the case. See section 907 (b) (5), supra. Inasmuch as it is apparent that petitioner can not establish a presumption by average computations that it bore the tax, by reason of the inherent defects in its statutory margin data, we do not find it necessary to make any determination as to the gross sales value of articles processed by petitioner, i.e., whether the selling price of petitioner's refined sugar should be adjusted for special or confidential allowances, freight absorption, cash discounts, warehousing charges and the various other allowances granted by petitioner in order to arrive at the actual gross sales value of the articles processed by petitioner. In endeavoring *375 to "explain away" the evidence offered by respondent to rebut any statutory presumption and to support its case aside from the presumption, petitioner has offered certain economic evidence to the effect that the increase in sugar prices on and after June 8, 1934, was due to the effective limitation of the supply of sugar in the American market under the quota system established by the Jones-Costigan Act and not to the processing tax. Petitioner has also offered evidence as to the effect of decreased duty rates on and after June 8, 1934, on raw sugar imported from Cuba, on petitioner's average margins based on raw sugar market prices. Our ruling as to the admissibility of this economic evidence was reserved at the hearing of this cause. In view of what has been heretofore stated, this economic evidence must be held to be inadmissible in this proceeding inasmuch as it does not appear that any such contentions or grounds were ever offered by petitioner to the Commissioner prior to the disallowance of its claim. In further support of its contention that it absorbed the burden of the processing tax, petitioner has submitted data showing its actual realization on tax-paid refined sugar *376 sold during the tax period as compared with the price ($.04019350 per pound) realized by petitioner immediately prior to the imposition of the processing tax (i.e. June 1, to 7, 1934). Petitioner would have us hold that it bore the burden to the extent that its realization in excess of $.04019350 was less than $.00535 (the amount of the processing tax) on each pound of sugar refined. If we sustained petitioner's contention we would in effect be holding that throughout the tax period petitioner was "guaranteed" a return of its average selling price for the June 1, to 7, 1934, period plus the amount of the processing tax. This amounts to a new type of margin computation which is in no way authorized by the statute. This computation ignores the rise and fall of the cost of petitioner's commodity during the tax period and it is obvious that any determination made on this basis as to the amount of tax burden borne by petitioner would be grossly distorted. If the presumption be considered to be out of the case, is there such evidence properly before us from which we would be entitled to determine that petitioner is entitled to a refund in any amount? We think not. We have carefully considered *377 the voluminous and complicated record before us and we can not say that within the meaning of section 902 (a) of the Revenue Act of 1936, the petitioner has proved that it bore the burden of the tax or any part thereof. [4]
*378 Decision will be entered for the respondent. Footnotes
*. The production quantity in terms of raw sugar may be obtained by multiplying the refined production figures by 1.07.↩
1. Petitioner's indirect expenses included, for example, the wages of the overseer who supervised the growing of the plant cane as well as stubble cane, and who also was in charge of feed and other crops grown by petitioner; repairs to roads, bridges, vehicles, buildings and fences; labor, feed and other expenses in connection with the stables; general drainage; and garden crops and wood furnished to laborers.↩
*. The average invoice price per pound was obtained by dividing the total sales by the number of pounds sold in each of the months indicated. ↩
**. Total Value of Production was obtained by multiplying Quantity of Sugar Refined (punds) by Average Invoice Price per Pound in each of the months indicated. ↩
*. Value of 288,508 gallons of edible molasses.↩
*. Instructions pertaining to Form 79: 7. Facts and evidence. - (a) The claimant shall set forth in his claim in detail each ground upon which the refund is claimed. It is incumbent upon the claimant to prepare a true and complete claim and to present and substantiate by clear and convincing evidence all the facts necessary to establish his claim to the satisfaction of the Commissioner; failure to do so will result in the disallowance of the claim. The claimant is required to set forth clearly the facts of his claim and is privileged to prove those facts in any manner available to him and to submit such evidence to that end as he may desire. * * *
(c) Other evidence. - In addition to the showing as to margins, the claimant is privileged to submit with his claim any other evidence available to him tending to establish that he bore the burden of the tax. Such evidence may be submitted to support the presumption to be drawn from the margins if such presumption is in favor of the claimant, or to rebut such presumption if it is against him. (See sec. 902 subsec. (e) of sec. 907 of the act, set forth in par. 1 of these instructions.)↩
2. REVENUE ACT OF 1936. SEC. 907. Evidence and Presumptions. (b) The average margin for the tax period and the average margin for the period before and after the tax shall each be determined as follows: * * * * *
(5) Cost of Commodity.--The cost of commodity processed during each month shall be (a) the actual cost of the commodity processed if the accounting procedure of the claimant is based thereon, or (b) the product computed by multiplying the quantity of the commodity processed by the current prices at the time of processing for commodities of like quality and grade in the markets where the claimant customarily makes his purchases.↩
3. SEC. 907. EVIDENCE AND PRESUMPTIONS. (a) Where the refund claimed is for an amount paid or collected as processing tax, as defined herein, it shall be prima-facie evidence that the burden of such amount was borne by the claimant to the extent (not to exceed the amount of the tax) that the average margin per unit of the commodity processed was lower during the tax period than the average margin was during the period before and after the tax. If the average margin during the tax period was not lower, it shall be prima-facie evidence that none of the burden of such amount was borne by the claimant but that it was shifted to others. (b) The average margin for the tax period and the average margin for the period before and after the tax shall each be determined as follows: (1) Tax Period. - The average margin for the tax period shall be the average of the margins for all months (or portions of months) within the tax period. The margin for each month shall be computed as follows: From the gross sales value of all articles processed by the claimant from the commodity during such month, deduct the cost of the commodity processed during the month and deduct the processing tax paid with respect thereto. The sum so ascertained shall be divided by the total number of units of the commodity processed during such month, and the resulting figure shall be the margin for the month. (2) Period Before and After the Tax. - The average margin for the period before and after the tax shall be the average of the margins for all months (or portions of months) within the period before and after the tax. The margin for each such month shall be computed as follows: From the gross sales value of all articles processed by the claimant from the commodity during such month, deduct the cost of the commodity processed during the month. The sum so ascertained shall be divided by the number of units of the commodity processed during such month, and the resulting figure shall be the margin for the month. (3) Average Margin. - The average margin for each period shall be ascertained in the same manner as monthly margins under subdivisions (1) and (2), using total gross sales value, total cost of commodity processed, total processing tax paid, and total units of commodity processed, during such period. * * * * *
(6) Gross Sales Value of Articles. - The gross sales value of articles shall mean (a) the total of the quantity of each article derived from the commodity processed by the claimant during each month multiplied by (b) the claimant's sale prices current at the time of processing for articles of similar grade and quality. (7) The quantity of each article derived from the commodity processed may be either (a) the actual quantity obtained, as shown by the records of the claimant, or (b) an estimated quantity computed by multiplying the quantity of commodity processed by appropriate conversion factors giving the quantity of articles customarily obtained from the processing of each unit of the commodity. (c) The "tax period" shall mean the period with respect to which the claimant actually paid the processing tax to a collector of internal revenue and shall end on the date with respect to which the last payment was made. The "period before and after the tax" shall mean the twenty-four months (except that in the case of tobacco it shall be the twelve months) immediately preceding the effective date of the processing tax, and the six months, February to July, 1936, inclusive. If during any part of such period the claimant was not in business, or if his records for any part of such period are so inadequate as not to provide satisfactory data on prices paid for commodities purchased or prices received for articles sold, the average prices paid or received by representative concerns engaged in a similar business and similarly circumstanced may with the approval of the Commissioner, where necessary for a fair comparison, be substituted in making the necessary computations. If the claimant was not in business during the entire period before and after the tax, the average margin, during such period, of representative concerns engaged in a similar business and similarly circumstanced, as determined by the Commissioner, shall be used as his average margin for such period. (d) If the claimant made any purchase or sale otherwise than through an arm's-length transaction, and at a price other than the fair market price, the Commissioner may determine the purchase or sale price to be that for which such purchases or sales were at that time made in the ordinary course of trade. (e) Either the claimant or the Commissioner may rebut the presumption established by subsection (a) of this section by proof of the actual extent to which the claimant shifted to others the burden of the processing tax. Such proof may include, but shall not be limited to - (1) proof that the difference or lack of difference between the average margin for the tax period and the average margin for the period before and after the tax was due to changes in factors other than the tax. Such factors shall include any clearly shown change (A) in the type or grade of article or commodity, or (B) in costs of production. If the claimant asserts that the burden of the tax was borne by him and the burden of any other increased costs was shifted to others, the Commissioner shall determine, from the effective dates of the imposition or termination of the tax and the effective date of other changes in costs as compared with the date of the changes in margin (when margins are computed for weeks, months, or other intervals between July 1, 1931, and August, 1 36, &n the manne- spec&f&ed in subsection (b)), and from the general experience of the industry, whether the tax or the increase in other costs was shifted to others. If the Commissioner determines that the difference in average margin was due in part to the tax and in part to the increase in other costs, he shall apportion the change in margin between them; (2) proof that the claimant modified existing contracts of sale or adopted a new form of contract of sale, to reflect the initiation, termination, or change in amount of the processing tax, or at any such time changed the sale price of the article (including the effect of a change in size, package, discount terms, or any other merchandising practice) by substantially the amount of the tax or change therein, or at any time billed the tax as a separate item to any vendee or indicated by any writing that the sale price included the amount of the tax, or contracted to refund any part of the sale price in the event of recovery of the tax or decision of its invalidity; but the claimant may establish that such acts were caused by factors other than the processing tax, or that they do not represent his practice at other times.↩
4. SEC. 902. CONDITIONS ON ALLOWANCE OF REFUNDS. No refund shall be made or allowed, in pursuance of court decisions or otherwise, of any amount paid by or collected from any claimant as tax under the Agricultural Adjustment Act, unless the claimant establishes to the satisfaction of the Commissioner in accordance with regulations prescribed by him, with the approval of the Secretary, or to the satisfaction of the trial court, or the Board of Review in cases provided for under section 906, as the case may be - (a) That he bore the burden of such amount and has not been relieved thereof nor reimbursed therefor nor shifted such burden, directly or indirectly, (1) through inclusion of such amount by the claimant, or by any person directly or indirectly under his control, or having control over him, or subject to the same common control, in the price of any article with respect to which a tax was imposed under the provisions of such Act, or in the price of any article processed from any commodity with respect to which a tax was imposed under such Act, or in any charge or fee for services or processing; (2) through reduction of the price paid for any such commodity; or (3) in any manner whatsoever; and that no understanding or agreement, written or oral, exists whereby he may be relieved of the burden of such amount, be reimbursed therefor, or may shift the burden thereof; or * * * * *↩